**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| ANGELOS WASHINGTON,<br><br>*Plaintiff*,<br><br>v.<br><br>CENTURION OF TENNESSEE, LLC, et al.,<br>*Defendants*. | ) | Case No. 1:26-cv-107<br><br>Judge Travis R. McDonough<br><br>Magistrate Judge Christopher H. Steger |

**MEMORANDUM & ORDER**

Plaintiff Angelos Washington, a prisoner in the custody of the Tennessee Department of Correction ("TDOC") currently incarcerated at the Morgan County Correctional Complex ("MCCX"), filed a complaint under 42 U.S.C. § 1983 and Tennessee law (Doc. 1), a motion for leave to proceed *in forma pauperis* (Doc. 6), a motion for appointment of counsel (Doc. 7), a motion to correct the names of Defendants (Doc. 9), a motion to reenter the motions from his miscellaneous case into this action (Doc. 10), a motion to effect service of process (Doc. 11), and a motion for a ruling on his pending motions (Doc. 13). For the reasons set forth below, the Court will **GRANT** Plaintiff's motion to proceed *in forma pauperis*; **DENY** his motion for counsel; **GRANT** his motion to correct names; **DENY** his motion to reenter motions as moot; **GRANT** his motion to effect service of process insofar as it will order the United States Marshals Service ("USMS") to serve any process in this action; **GRANT** his motion for a ruling on his pending motions; permit certain claims to **PROCEED** against Centurion of Tennessee, LLC ("Centurion") and Defendants Jones, Human, Wyrick, and Hill in their individual capacities; and **DISMISS** all remaining claims and Defendants.

## I. PLAINTIFF'S MOTIONS

### A. Motion to Proceed *In Forma Pauperis*

Under the Prison Litigation Reform Act ("PLRA"), a prisoner bringing a civil action may apply for permission to file suit without prepaying the filing fee. *See* 28 U.S.C. § 1915(a). A review of Plaintiff's motion (Doc. 6) demonstrates that he lacks sufficient financial resources to pay the filing fee in a lump sum. Accordingly, pursuant to 28 U.S.C. § 1915, this motion (*id.*) will be **GRANTED**.

Plaintiff will be **ASSESSED** the civil filing fee of $350.00. The custodian of Plaintiff's inmate trust account will be **DIRECTED** to submit to the Clerk, U.S. District Court, 900 Georgia Avenue, Suite 309, Chattanooga, Tennessee, 37402 as an initial partial payment, whichever is the greater of: (a) twenty percent (20%) of the average monthly deposits to Plaintiff's inmate trust account; or (b) twenty percent (20%) of the average monthly balance in his inmate trust account for the six-month period preceding the filing of the complaint. 28 U.S.C. § 1915(b)(1)(A) and (B). Thereafter, the custodian of Plaintiff's inmate trust account shall submit twenty percent (20%) of his preceding monthly income (or income credited to his trust account for the preceding month), but only when such monthly income exceeds ten dollars ($10.00), until the full filing fee of three hundred and fifty dollars ($350.00) has been paid to the Clerk. 28 U.S.C. §§ 1914(a), 1915(b)(2).

The Clerk will be **DIRECTED** to send a copy of this Order to the Court's financial deputy and the custodian of inmate trust accounts at Plaintiff's current facility to ensure compliance with payment of the filing fee.

### B. Motion to Appoint Counsel

Plaintiff moves the Court to appoint counsel, maintaining that court-appointed counsel is necessary given his indigency, physical disability, limited access to legal materials, and the case's complexity (Doc. 7).

Pursuant to 28 U.S.C. § 1915(e)(1) "[t]he court *may* request an attorney to represent any person unable to afford counsel" (emphasis added). However, "[a]ppointment of counsel in a civil case is not a constitutional right[,]" but a "privilege that is justified only by exceptional circumstances." *Lavado v. Keohane*, 992 F. 2d 601, 605–06 (6th Cir. 1993) (internal citations omitted). In determining whether "exceptional circumstances" exist, the Court considers "the complexity of the case and the ability of the plaintiff to represent himself." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 461 (6th Cir. 2019) (citing *Lavado*, 992 F.2d 601). Like *Cavin*, this case does not contain complex legal issues and it appears that Plaintiff has adequately represented himself. Further, indigency, limited access to legal materials, and unfamiliarity with the law are conditions common among prisoners, and these do not constitute exceptional circumstances warranting the appointment of counsel at taxpayer expense. Accordingly, Plaintiff's motion for the appointment of counsel (Doc. 7) will be **DENIED**.

### C. Motion to Add Full Names of Defendants

Plaintiff has filed a motion to add the full names of certain Defendants (Doc. 9). The motion is well taken and will be **GRANTED**. The Clerk will be **DIRECTED** to update the docket to correctly reflect Nurse Deniece as "Deniece Davis"; Nurse Beth as "Bethany Wyrick"; Nurse Elizabeth as "Elizabeth Byrd"; Nurse Sharp as "Darla Sharp"; and Nurse Amanda as "Amanda Hill."

### D. Motion to File Motions from Plaintiff's Miscellaneous Case

Plaintiff's complaint and initial motions were originally opened in a miscellaneous case, because Plaintiff did not submit the filing fee or a motion to proceed *in forma pauperis*. *See Washington v. Centurion of Tennessee, LLC*, No. 1:26-MC-12. But that case, and documents filed in it, were transferred to this civil action when Plaintiff submitted his motion to proceed *in forma pauperis*. Therefore, this motion (Doc. 10) will be **DENIED** as moot.

### E. Motion to Effect Service of Process

Plaintiff asks the Court to order process to issue and USMS to serve process in this case, so that service may be timely completed under the Federal Rules of Civil Procedure (Doc. 11). Because the Court has permitted Plaintiff to proceed *in forma pauperis*, Plaintiff's motion will be **GRANTED** insofar as the USMS will be ordered to attempt service of process on Plaintiff's behalf. *See* 28 U.S.C. § 1915(d).

### F. Motion for a Ruling on Pending Motions

Plaintiff's motion for the Court to rule on his pending motions (Doc. 13) will be **GRANTED** insofar as this Order resolves those requests.

## II. SCREENING OF COMPLAINT

### A. Screening Standard

Under the PLRA, district courts must screen prisoner complaints and *sua sponte* dismiss any claims that are "frivolous, malicious, or fail[] to state a claim upon which relief may be granted," or "seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* 28 U.S.C. § 1915(e)(2)(B); *Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999). The dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure to state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant

statutory language tracks the language in Rule 12(b)(6)" of the Federal Rules of Civil Procedure. *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (citations omitted). Thus, to survive an initial review under the PLRA, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Courts should liberally construe pro se pleadings filed in civil rights cases and hold them to a less stringent standard than lawyer-drafted pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Even so, allegations that give rise to a mere possibility that a plaintiff might later establish undisclosed facts supporting recovery are not well-pled and do not state a plausible claim. *Twombly*, 550 U.S. at 555, 570. Further, formulaic and conclusory recitations of the elements of a claim which are not supported by specific facts are insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681.

To state a claim against any Defendant, Plaintiff must establish that a "person" acting "under color of" state law deprived him of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.

### B. Plaintiff's Allegations[1]

A 2001 gunshot wound left Plaintiff partially paralyzed from the waist down and mostly dependent upon a wheelchair for mobility. (*See* Doc. 1, at 5.) Plaintiff has "very little movement" in his legs and has no control over his bladder or bowels, which requires him to use

[1] Plaintiff's attached grievance records form part of the complaint. *See Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) ("[D]ocuments attached to the pleadings become part of the pleadings[.]") (citing Fed. R. Civ. P. 10(c))). Thus, the Court includes the allegations contained in those records in its factual recitation. And, to the extent these exhibits contradict the complaint, "the exhibit trumps the allegations." *Brown v. Louisville-Jefferson Cnty. Metro Gov't*, 135 F.4th 1022, 1030 (6th Cir. 2025) (citing *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 576 (6th Cir. 2021)).

catheters to urinate and adult diapers to contain his bowel movements and cover the bedsore on his right buttock. (*Id.* at 5–6.)

Plaintiff entered TDOC custody in 2022, after he was sentenced to 30 years of incarceration for first-degree murder. (*Id.* at 6.) Plaintiff was initially housed at the Bledsoe County Correctional Complex[2] ("BCCX") before he was transferred to MCCX on June 4, 2024. (*Id.*) Plaintiff "received fair medical treatment" at MCCX until December 4, 2024, "when things . . . took a turn for the worse." (*Id.*)

During breakfast service on the morning of December 4, 2024, Plaintiff asked Warden Stacey Oakes if he could "go to the old compound clinic" for bedsore wound treatment, noting that he had a clinic pass form and was already almost three hours behind the original scheduling time. (*Id*. at 6–7.) Warden Oakes told Plaintiff that things were "kind of slow this morning and that if it[']s not an emergency, you can wait and you'll be just fine." (*Id.* at 7.) Plaintiff advised Warden Oakes that if he did not receive "wound[]care treatment in the next [10] minutes, [he would] file a grievance about it and add this matter to [his] lawsuit." (*Id.*) Warden Oakes replied, "What[']s your name, pack your shit, I'm moving your ass back across the field to the triangle." (*Id.*) The triangle is "the more dangerous side of the prison." (*Id.*) When Plaintiff began writing down these events, Warden Oakes slapped Plaintiff in the face and slapped the pen and paper out of Plaintiff's hand. (*Id.*) Warden Oakes ordered an officer to escort Plaintiff to high security, and he falsely charged Plaintiff with creating a disturbance. (*Id.*) Plaintiff filed a grievance about the incident and appealed it through the proper channels, but he never received a final grievance response. (*Id.*) During his incarceration, at least ten doctors employed by

[2] Plaintiff's medical care at BCCX was the subject of a separate lawsuit, *see Washington v. Centurion of Tennessee, LLC*, No. 1:24-CV-284-CEA-MJD.

TDOC's contract medical provider, Centurion of Tennessee, LLC ("Centurion"), have diagnosed Plaintiff with paralysis without consulting Plaintiff's outside medical records. (*Id.* at 9.)

Plaintiff also has neuropathy, a painful nerve condition, but none of Centurion's medical providers have scheduled Plaintiff for an appointment with a spinal cord specialist or neurologist to verify the disease. (*Id.* at 10.) On November 19, 2024, Nurse Practitioner ("NP") Caleigh Cline prescribed Plaintiff gabapentin, a non-formulary drug designed to treat neuropathy. (*Id.*) The medication was approved by Medical Director Dr. Emma Rich and the Offender Management Office of TDOC. (*Id.*) On the same date, NP Cline ordered Plaintiff some adult diapers (i.e., Depends) and catheter supplies. (*Id.*)

In January 2025, NP Raelan Duncan renewed orders for Plaintiff to receive Depends and catheter supplies for 6 months. (*Id.* at 10, 11.) On January 21, 2025, NP Duncan discontinued Plaintiff's Depends order without meeting with Plaintiff or advising him why she was discontinuing the order. (*Id.* at 11.) "All of the nurses did not know" why NP Duncan discontinued Plaintiff's Depends order, but "all of the nurses kept on giving [him] a pack of briefs every week." (*Id.*)

One month later, on February 19, 2025, Dr. Racheal[3] Agard and Medical Assistant ("MA") Teniesha Dvorak came to Plaintiff's cell in the high-security unit. (*Id.*) After Plaintiff was handcuffed by Correctional Officer ("CO") Thorton, Dr. Agard conducted a rectal examination of Plaintiff. (*Id.* at 11–12.) After determining that Plaintiff could not move his prostate and had no control over his bladder or bowels, Dr. Agard ordered Plaintiff to receive adult diapers for 6 months. (*Id.* at 12.)

[3] Plaintiff spells this provider's name both as "Racheal" (*see* Doc. 1, at 1) and "Rachael" (*see id.* at 11).

Sometime between January 1, 2025, and February 20, 2025, Medical Director Dr. Caleb Jones approached Plaintiff's cell and inquired whether Plaintiff would be interested in taking the medication Pamelor ("nortriptyline") instead of gabapentin, because gabapentin was "to[o] expensive." (*Id.* at 13, 37.) Plaintiff declined, stating that gabapentin worked "just fine for [his] nerve pain." (*Id.* at 13.) Dr. Jones stated, "We need to try a fucken [sic] cheaper medication!" (*Id.*) When Plaintiff asked Dr. Jones not to curse at him, Dr. Jones stated, "I can say what the fuck I want and talk how I want." (*Id.*) Plaintiff filed a grievance about this incident as soon as Dr. Jones left Plaintiff's cell door. (*Id.*) Cpl. Harris told Plaintiff that the grievance was forwarded to Heath Services Administrator ("HSA") Pete Wright, who did not respond to the grievance. (*Id.*)

On March 6, 2025, NP April Barton requested Plaintiff receive another 30-day order for gabapentin, and that request was approved the following day by Dr. Rich. (*Id.* at 14, 55.) But on April 2, 2025, NP Barton discontinued the gabapentin "for no apparent reason" and without notice or substitution. (*Id.* at 14.) HSA Wright responded to Plaintiff's grievance about the discontinuation by noting that Plaintiff was non-complaint with the medication, Dr. Jones and NP Barton had discussed the possibility of discontinuation with Plaintiff if the behavior persisted, and that lab test results on March 27, 2025, showed an "almost undetectable" level of the medication in Plaintiff's system, which indicated diversion. (*Id.* at 55.) In an order, NP Barton wrote that she would "discuss Pamelor/[C]ymbalta[,]" even though Pamelor had previously been prescribed to Plaintiff and is less effective than gabapentin. (*Id.* at 14.) NP Barton wrote an order for Plaintiff to receive Pamelor on April 4, 2025. (*Id.* at 15, 55.)

On April 16, 2025, Plaintiff's prescription for Pamelor was discontinued due to its ineffectiveness and side effects, which NP Barton already knew would be the case. (*Id.* at 15.)

Dr. Jones had Plaintiff removed from his cell and escorted to the front of the pod on May 9, 2025, for a follow-up visit. (*Id.* at 16.) There, in front of entire pod, Dr. Jones began discussing Plaintiff's medical and "private" issues. (*Id.*) Plaintiff signed a treatment plan at the beginning of the meeting, and Dr. Jones asked why Plaintiff needed Depends if he used catheters. (*Id.*) Plaintiff explained that he needed the Depends due to bladder leakage and his inability to control his bowel movements. (*Id.* at 16–17.) Plaintiff informed Dr. Jones that he had used both catheters and Depends for the previous 24-year period. (*Id.* at 17.) Nonetheless, Dr. Jones told Plaintiff it was too expensive for him to use both Depends and catheters, and that he did not need both. (*Id.*) Dr. Jones also stated, "[S]ince you want to file grievances on me, . . . I'm gonna [sic] perform a test study" to determine whether Plaintiff actually required catheters, Depends, and a wheelchair. (*Id.*) Plaintiff tried to refuse the test study, but Dr. Jones told him he could not refuse and stated his intention to enter an order for Plaintiff to go to the main clinic's infirmary. (*Id.* at 18.) When Plaintiff told Dr. Jones he had the right to refuse the test study, Dr. Jones threatened to have officers come to Plaintiff's cell with tasers and use force to get him to the infirmary. (*Id.*) Dr. Jones then exited the pod, and Plaintiff was returned to his cell. (*Id.*)

At approximately 1:30 to 2:15 p.m. on the afternoon of May 9, 2025, Sgt. Caleb Armes and Cpl. Evans arrived at Plaintiff's cell to escort him to the infirmary, but Plaintiff stated, "No, I refuse." (*Id.*) Sgt. Armes told Plaintiff that he would be tased unless he got into his wheelchair and let them escort him to the infirmary. (*Id.* at 18, 19.) Plaintiff informed both Sgt. Armes and Cpl. Evans that the study was a retaliatory act by Dr. Jones, but Plaintiff was nonetheless compelled to comply out of fear that he would be tased if he continued to refuse. (*Id.* at 19.) Plaintiff was then transported to the main clinic infirmary. (*Id.*)

Upon arriving at the infirmary, Plaintiff was placed in Room 106, and his vital signs were taken by Nurse Tyler Trout. (*Id.*) Nurse Trout had Plaintiff transfer himself from the wheelchair to the bed, and Nurse Trout removed the wheelchair from the room and told Plaintiff that Dr. Jones had discontinued his wheelchair order. (*Id.* at 19–20.) Dr. Jones then entered Plaintiff's room and told Plaintiff that he was discontinuing the wheelchair to see how well Plaintiff could walk without it, and that he was discontinuing Plaintiff's Depends and catheter orders to assess Plaintiff's bladder control. (*Id.* at 20.) Plaintiff told Dr. Jones he could not urinate without a catheter, that his bladder otherwise leaks, and that he could not "walk that good [sic] due to" weakness in his legs, osteoarthritis in his right knee, an "expired" knee replacement in his left knee. (*Id.*) Dr. Jones told Plaintiff he would be fine and left the room. (*Id.* at 20–21.) Dr. Jones wrote an order for the on-shift nurses to assess Plaintiff for bladder distension every 6 hours and to notify Dr. Jones if there was concern for bladder distension. (*Id.* at 21.) Dr. Jones discontinued Plaintiff's catheter orders and told all nurses not to provide Plaintiff with Depends or his wheelchair. (*Id.*)

At around 3:45 p.m., Plaintiff realized his bladder was getting full, so he pressed the call button in his room to alert the nurse's station. (*Id.*) Nurse Tyler responded to Plaintiff's room at 3:57 p.m., and Plaintiff told him he needed a catheter to urinate. (*Id.*) Nurse Tyler told him the catheter order had been discontinued and to try to urinate on his own. (*Id.*) When Plaintiff told Nurse Tyler that he could not urinate without a catheter, Nurse Tyler advised him that "there's nothing he can do without an order." (*Id.* at 21–22.) At 5:02 p.m., Plaintiff told Nurse Tyler that his bladder was painfully full and that he needed a catheter. (*Id.* at 22.) Nurse Tyler denied his request. (*Id.*) Plaintiff pressed the call button again at 5:48 p.m. and requested a new Depends, as the one he was wearing was soiled from leaked urine. (*Id.*) Nurse Tyler again denied

Plaintiff's request based on Dr. Jones' instructions to the nurses. (*Id.*) He also denied Plaintiff's request for his wheelchair for the same reason. (*Id.*)

At 7:30 p.m. on May 9, 2025, Nurse Brad came to Plaintiff's cell door and asked Plaintiff if he needed anything. (*Id.* at 24.) Plaintiff told Nurse Brad that his bladder was full, that he only had one kidney, and that he would have kidney failure if he did not empty his bladder soon. (*Id.*) Nurse Brad stated he would need to contact the on-call physician and obtain an emergency order. (*Id.* at 24.) Nurse Brad subsequently told Plaintiff that Dr. Jones ordered Nurse Brad to examine Plaintiff to see how full his bladder was. (*Id.* at 24–25.) Dr. Jones purportedly told Nurse Brad that if Plaintiff's bladder felt "like a water balloon, then go ahead and give [Plaintiff] a catheter and a urinal" and record the output. (*Id.* at 25.) After Nurse Brad examined Plaintiff and discovered his bladder extremely full, he issued Plaintiff a catheter and urinal. (*Id.*) Plaintiff "put out over 1,000 cc[]s of urine[,] which is about 50–60 ounces." (*Id.*) Plaintiff then asked for a Depends, because the one Plaintiff was wearing was leaking from the sides. (*Id.*) Nurse Brad, without obtaining an order, "went and got a large adult [D]epend[s] and gave it to" Plaintiff. (*Id.*)

Plaintiff remained in the clinic's infirmary for approximately 2 weeks. (*Id.*) He was issued one catheter every six to eight hours and one large Depends every 6 to 8 hours, as needed. (*Id.*) But Plaintiff was denied his wheelchair for 2 weeks "out of staff retaliation." (*Id.* at 25–26.)

On May 23, 2025, Dr. Jones wrote an order for Plaintiff to be discharged back into "security's custody[,]" to continue an order for Plaintiff's catheters as needed; and to discontinue Plaintiff's Depends order. (*Id.* at 26.) He also ordered a neurology consult, nerve conduction studies, and a "CT monogram." (*Id.*) Before he left the infirmary, Plaintiff asked Dr. Jones why his Depends order was being discontinued, and Dr. Jones informed him that, due to Centurion's

"budget cut[s] to reduce the amount of money being spent on inmates['] medical needs[,]" it was too expensive to keep Plaintiff on both Depends and catheters. (*Id.*) Plaintiff pushed his wheelchair to intake to receive his property. (*Id.*) Plaintiff was "still able to take two packs of adult [D]epends and a box of 30 catheters with [him] to general population." (*Id.*)

Plaintiff wrote a grievance against Dr. Jones about the test-study observation period, and he requested a response from Grievance Officer Cpl. Delk. (*Id.* at 27–28.) Eight days later, he completed the third step of the grievance process but never heard a response. (*Id.* at 28.) Cpl. Delk "never checks the grievance boxes in the units." (*Id.*)

On June 18, 2025, Plaintiff noticed he only had four Depends left. (*Id.* at 29.) Plaintiff sent a request to NP Duncan for a renewed order for Depends and the results of his HIV and Hep-C tests. (*Id.*) On June 24 or 25, 2025, NP Duncan, NP Carrie White, and MA Dvorak came to Plaintiff's unit for a follow-up appointment. (*Id.*) Sgt. Scott Brisk retrieved Plaintiff from his cell and pushed Plaintiff in his wheelchair to see NPs Duncan and White "for the same complaint." (*Id.* at 29–30.) NP Duncan told Plaintiff that he had tested negative for both HIV and Hep-C and inquired whether Plaintiff had any questions. (*Id.* at 30.) When Plaintiff requested additional Depends and told NPs Duncan and White he "was completely out" of Depends, NP Duncan stated she would not order any Depends because Plaintiff was using catheters. (*Id.*) NP White then informed Plaintiff that Dr. Jones did not want Plaintiff using both Depends and catheters due to the cost, and that he could "only have one or the other." (*Id.*) Plaintiff cursed at both of them and was escorted to high security for assault on staff. (*Id.*)

Once Plaintiff arrived at high security, he filed a grievance on NPs Duncan and White. (*Id.* at 31.) Plaintiff exhausted the process, even though he never heard anything back from the grievance department. (*Id.*)

Between 7:00 and 8:50 p.m. on the same day, Plaintiff requested a Depends from Nurse Deniece, who stated, "I'm not giving you anything because you spitted [sic] on my fellow staff member Provider Duncan." (*Id.*) Plaintiff removed the Depends he was wearing, because he had a bowel movement. (*Id.* at 31–32.) He also did not have any catheters, because they had been taken by Lt. Carl Gaskin when Plaintiff was put into a room in intake. (*Id.* at 32.) Once Plaintiff was in the intake room, Lt. Gaskin and Cpl. Carol allowed Dr. Jones to remove a brown, poisonous spider from a small black container he retrieved from his pocket and throw it on Plaintiff's left shoulder. (*Id.*)

At 9:55 p.m. on June 24, 2025, Cpl. Payne came to Plaintiff's cell in high security with catheters sent by Nurse Josey, who had heard about the incident between Plaintiff and NP Duncan. (*Id.*) Plaintiff asked Cpl. Payne to ask Nurse Josey for some Depends. (*Id.*) Cpl. Payne left and returned at 10:20 p.m. (*Id.*) Cpl. Payne reported that Nurse Josey could not give Plaintiff a Depends because he did not have an order for them. (*Id.* at 32–33.)

Between 7:00 and 9:00 a.m. on June 25, 2025, Nurse Rhaylan Bowlin gave Plaintiff medications in his cell, and Plaintiff asked her if she could bring Plaintiff back some Depends, because his bladder had leaked all over his bed sheets and blanket. (*Id.* at 33.) Nurse Bowlin stated she would not return to the unit unless it was a medical emergency and walked away. (*Id.*)

That night, between 7:00 and 8:45 p.m., Nurse Amanda was passing medications when Plaintiff asked her to bring him some Depends and catheters. (*Id.*) Nurse Amanda responded, "Screw you" and walked away. (*Id.*) At this point, Plaintiff was forced to put a bath towel around his penis and buttocks. (*Id.*)

During the morning medication pass on June 26, 2026, Plaintiff asked Nurse Beth to provide him with catheters and Depends, showing her that he was wearing a bath towel as a makeshift diaper. (*Id.* at 34.) He also told her he was having to reuse the same catheter. (*Id.*)

Nurse Beth stated she would not return to the unit absent a medical emergency, but that she would "tell the charge nurse." (*Id.*) At the night shift medication pass that evening, Plaintiff made a similar request of Nurse Kristy, who stated she was not returning to the pod but would tell "them" to bring Plaintiff's catheters in the morning. (*Id.*) By this time, Plaintiff was wearing a plastic bag underneath his towel to stop urine from leaking on his wheelchair seat and pants. (*Id.*)

At morning medication pass the following day, June 27, 2025, Nurse Beth gave Plaintiff a box of 30 catheters. (*Id.*) When Plaintiff requested a Depends, Nurse Beth told Plaintiff that she was not coming back to the unit because she was tired and her knees were hurting, but that she would "tell the night nurse." (*Id.* at 35.) Plaintiff mailed a grievance on Nurses Beth, Kristy, Amanda, "and all of the other nurses." (*Id.*) Plaintiff pursued the grievance through the third step but has not heard anything in response to his grievance. (*Id.*) But the grievance box in the unit only gets checked once every two to three weeks. (*Id.*)

On June 28, 2025, Plaintiff requested a Depends from Nurse Elizabeth, who stated she could not provide Plaintiff one without an order. (*Id.*) On July 1, 2025, Plaintiff mailed letters to HSA Wright and Dr. Jones requesting an order for Depends, but he did not hear back from either of them. (*Id.*) On July 3, 2025, Plaintiff placed a sick call to Nurse Jesse about needing Depends, and although Nurse Jesse stated she would "try and bring some back," she never did. (*Id.* at 35–36.)

On July 4, 2025, Nurse Whitney gave Plaintiff his morning medications and asked what the nurses had been doing to treat Plaintiff's bedsore. (*Id.* at 36.) When Plaintiff informed her that he had not received wound care in two weeks, Nurse Whitney said she would look at the orders and be back at noon. (*Id.*) At 12:35 p.m., Nurse Whitney came to Plaintiff's cell, stated she did not feel like coming into Plaintiff's cell to perform wound care, and provided Plaintiff

with "mediplex dressing" to place on the wound. (*Id.*) She did not provide Plaintiff anything with which to clean the wound. (*Id.*)

On July 10, 2025, Plaintiff placed a sick call request with Nurse Bowlin for antibiotics, because his "bladder, bedsore, and whole body" had developed a methicillin-resistant Staphylococcus aureus ("MRSA") infection. (*Id.*)

Plaintiff received new catheters on July 10, 2025. (*Id.*) At 7:45 a.m. on July 11, 2025, Plaintiff told Nurse Beth that he "had a large MRSA infection knot under [his] left arm pit that came from wearing the same bath towel for almost 3 weeks" because of medical providers' failure to order him Depends. (*Id.* at 36–37.) Between July 12 and 30, 2025, NP Cline examined Plaintiff's MRSA knot in front of the pod. (*Id.* at 37.) She diagnosed Plaintiff with an MRSA infection and ordered Plaintiff a seven-day course of antibiotics. (*Id.*). Plaintiff informed NP Cline that the infection was caused by wearing a towel and a plastic bag for weeks, which caused a build-up of bacteria, but NP Cline stated she would not order Plaintiff Depends because of Dr. Jones' instructions. (*Id.*)

Sometime between 10:00 and 10:45 a.m. on August 9, 2025, Sgt. Paul Pappas came to Plaintiff's cell and asked him if he wished to attend a telehealth appointment in the medical clinic. (*Id.* at 67–68.) Plaintiff stated he did, and Sgt. Pappas told Plaintiff he would return in ten minutes to escort him to the clinic. (*Id.* at 68.) At 11:00, Cpl. Allen came to escort Plaintiff to the clinic, and Plaintiff stated he needed a Depends due to leakage. (*Id.*) Cpl. Allen dispatched Sgt. Pappas about the request and stated he would check with medical. (*Id.*) He left and returned approximately ten minutes later with a refusal form. (*Id.*) Since Plaintiff was not refusing the appointment, he declined to sign the form. (*Id.*) At 11:47 a.m., Cpl. Allen again approached Plaintiff's cell and asked whether Plaintiff wanted to move to general population, to which Plaintiff responded, "Yes, but I need an adult [D]epend[s] from medical" and new pants,

because both his Depends and pants were soiled with urine. (*Id.*) Cpl. Allen stated he would see what he could do but returned at 12:15 p.m. with a disciplinary write up for refusing a cell assignment ("RCA"). (*Id.*) Plaintiff filed a grievance about the issue, to which HSA Wright responded. (*Id.* at 70.) HSA Wright responded that: (1) Plaintiff does not have a supporting diagnosis for Depends to be ordered; (2) a provider's diagnosis is not grievable; (3) Plaintiff does not have a diagnosis of paralysis; (4) Plaintiff "has been observed and noted in his chart as able to ambulate"; and (4) Plaintiff "refused the CT to determine any degree of injury and has refused physical therapy to help rebuild strength." (*Id.*)

On September 16, 2025, Plaintiff received a chronic-care visit in the medical triage room. (*Id.* at 77–78.) Plaintiff "was being seen" by NP White, Dr. Jones, MA Dvorak, and Nurse Assistant ("NA") Christia Dickerson. (*Id.* at 78.) Plaintiff maintains that during this visit, he became afraid for his life and "assaulted" NA Dickerson. (*Id.*) Plaintiff was pulled out of the room and the door shut behind him, "for the safety of them both." (*Id.*) Plaintiff states that while he was waiting in his wheelchair for the door to be opened so that CO Huffman could push Plaintiff back to his cell, Dr. Jones rushed out and pushed Plaintiff in the face, even though Plaintiff was restrained and sitting in his wheelchair at the time. (*Id.*)

Dr. Jones responded to Plaintiff's grievance about the incident. (*Id.* at 75.) Dr. Jones stated that when Plaintiff arrived to the clinic, he was asked to step on the scale. (*Id.*) Plaintiff stated, "I am paralyzed. I can't stand up[,]" to which NA Dickerson replied, "We have all seen you walking." (*Id.*) Dr. Jones noted that Plaintiff had "been observed during a previous infirmary admission standing up, ambulating freely around his room as well as dragging his furniture around his room." (*Id.*) At the end of the visit, Plaintiff purportedly stated, "I got something coming for you and that bitch Raelan" and spit on NA Dickerson. (*Id.*) Plaintiff rolled himself out of the clinic, and Dr. Jones "jumped up and confronted [Plaintiff] about

assaulting CNA Dickerson by spitting on her." (*Id.*) Plaintiff attempted to spit on Dr. Jones and grabbed Dr. Jones by the collar of his shirt and attempted to pull Dr. Jones toward himself. (*Id.*) Plaintiff was handcuffed in the wheelchair at the time, so Dr. Jones braced himself on the armrest of the wheelchair to avoid falling onto Plaintiff. (*Id.*) COs "Deluca and Hoffman were present and helped de-escalate the situation." (*Id.*) Dr. Jones' shirt was "pried free of [Plaintiff's] grip[,] and [Plaintiff] was returned to his cell." (*Id.*)

Dr. Jones reported that neither NA Dickerson nor any other medical staff was ever threatening toward Plaintiff, and he was never shoved in the face while Dr. Jones was present. (*Id.*) Dr. Jones was informed that Plaintiff had refused to make a statement to Internal Affairs ("IA") regarding the incident. (*Id.*) Dr. Jones also recorded that Plaintiff "has an extensive history of assault and offence against medical staff." (*Id.*) Dr. Jones noted it was the third incident of Plaintiff spitting on medical staff during his tenure, and that since Plaintiff was "known to be a carrier of a highly infectious disease[,]" his spitting attempts should be considered assault. (*Id.*) He also noted that since Plaintiff has accessed his medical records on many occasions, he has knowledge of his diagnosed infectious disease and has made an "obvious attempt to transmit infection." (*Id.*)

IA investigated the incident and determined that Plaintiff assaulted NA Dickerson. (*Id.*) On November 13, 2025, HSA Wright noted that Plaintiff "continues to be combative and aggressive toward providers and staff when he does not receive the desired results from his complaints despite relevant clinic data." (*Id.*)

At 6:12 a.m. on October 9, 2025, Officer A. Delvin approached Plaintiff's cell and asked whether he was "ready to go to special needs for an outside appointment." (*Id.* at 37.) Officer Delvin did not know the reason for the appointment. (*Id.* at 38.) Plaintiff stated he wanted to go but realized that he did not have any towels to use as a Depends, and he "needed emergency

assistance because the towel that [he] had on was completely covered in urine" and had a strong, foul odor. (*Id.* at 38.) Plaintiff asked Officer Delvin if he would call medical and inform them that Plaintiff was having a medical emergency and needed a Depends so that he could get to his appointment. (*Id.*) Officer Delvin stated, "You don't look like you're having a[n] emergency, but I'll call medical and see if someone could come and talk to you." (*Id.*) Officer Delvin came to Plaintiff's cell at 6:48 a.m. and stated that someone would be by to speak to Plaintiff "shortly." (*Id.*)

At 7:30 a.m., Officer Delvin and Nurse Whitney came to Plaintiff's cell and administered Plaintiff's morning medications. (*Id.*) Nurse Whitney told Plaintiff "that the appointment at special needs was for a test study and a CT monogram scan of [his] spine[,]" but that Dr. Jones told transportation to "refuse [Plaintiff] and go without [him], all because [Plaintiff] needed an adult [D]epend[s] to put on" for the appointment. (*Id.* at 38–39.) Nurse Whitney told Plaintiff he would be charged with a $10 fee for refusing the outside appointment, to which Plaintiff objected. (*Id.* at 39.) Plaintiff refused to sign the inmate personal withdrawal for the $10 refusal fee, so Nurse Whitney signed it, and Officer Delvin witnessed it. (*Id.*) The fee was paid on November 4, 2025. (*Id.*)

Sometime before noon on October 13, 2025, a Medical Consultant Elbert Springs came to Plaintiff's cell asking Plaintiff to sign a personal withdrawal trust-fund form for the $10 refusal fee. (*Id.*) Plaintiff told Mr. Springs that Nurse Whitney had already turned in a withdrawal form, but Mr. Springs told Plaintiff to sign his form, and that he would ensure the other form was disposed of if he saw it. (*Id.* at 39–40.) Mr. Springs also told Plaintiff he should have gone to his appointment. (*Id*. at 40.) Plaintiff refused to sign the form, and Mr. Springs put "refuse to sign" on the form, witnessed it, and submitted it. (*Id.*) On November 4, 2025, this $10 was also deducted from Plaintiff's account, so Plaintiff paid twice for one missed

appointment. (*Id.*) Plaintiff filed a grievance about the matter on October 14, 2025, but he never heard anything back from the grievance department. (*Id.* at 40–41.)

On December 10, 2025, Plaintiff was transferred to Unit 21-C, cell 109. (*Id.* at 42.) Plaintiff was without Depends "all this time" and wore a bath towel and a plastic bag in lieu of Depends. (*Id.*) The only medical provider who consistently performed her duty and brought Plaintiff Depends despite him not having an order for them was Nurse Sharp. (*Id.*) Plaintiff requested Depends from Nurse Sharp on January 7, 2026, and she gave him a pack of Depends that evening—the first pack he had received in 7 months. (*Id.*)

On January 18, 2026, Plaintiff requested Depends from Nurse Sharp after evening medication pass, and she provided Plaintiff with a pack of Depends that she had stored in the bottom drawer of the medication cart. (*Id.* at 43.) She provided Plaintiff Depends again on February 14, 2026. (*Id.*) Nurse Sharp approached Plaintiff's cell on February 27, 2026, and asked if he needed anything. (*Id.*) Plaintiff informed Nurse Sharp that he had only one Depends left and asked if she could bring him some more. (*Id.*) Nurse Sharp stated that MA Dvorak told Nurse Sharp not to provide Plaintiff additional Depends because he did not have an order for them. (*Id.*)

On March 13, 2026, Plaintiff noticed he had developed another painful MRSA infection—this time under his right arm pit—because he had to revert to wearing a bath towel and a plastic bag as a makeshift Depends. (*Id.* at 44.) Plaintiff would vomit when he ate because of the infection. (*Id.*) So, on March 13, 2026, Plaintiff turned in a sick call. (*Id.*) No one ever came to assess him. (*Id.*)

On March 18, 2026, NP Carrie White and NA Christia Dickerson approached Plaintiff's cell, and NP White asked to see the MRSA knot Plaintiff had been complaining about to the nursing staff. (*Id.*) Plaintiff showed NP White the knot, and NP White said, "Ooh, that looks

awful" and that she would order Plaintiff a 7-day course of antibiotics. (*Id.*) She inquired whether Plaintiff had any additional complaints, and Plaintiff said that he needed an order for Depends. (*Id.* at 44–45.) Plaintiff informed her that wearing a towel and plastic bag in lieu of Depends caused him to develop the MRSA infection and sores between his thighs and in his genital area. (*Id.* at 45.) NP White stated she could not order Depends because of Dr. Jones' instructions, but that she would talk to him about it. (*Id.*)

Because of these events, Plaintiff filed the instant action alleging violations of his civil rights under § 1983 and Tennessee law against Centurion and 27 individual Defendants in both their official and individual capacities, seeking monetary damages, the award of costs and attorney fees, and injunctive relief. (*Id.* at 1, 3, 49–50.)

### C. Analysis

Plaintiff's complaint explicitly raises claims that: (1) Defendants acted with deliberate indifference to his serious medical needs (*see, e.g.*, *id.* at 14, 15,16,17, 21, 22–24, 26); (2) Dr. Jones and staff retaliated against him (*id.* at 17, 18, 33); (3) Defendants Armes and Evans threatened him with excessive force (*id.* at 19); (4) his constitutional right to be free from involuntary servitude was violated (*id.* at 28–29); (5) his grievances are met with deliberate indifference (*id.* at 35); (6) Defendants' conduct gives rise to claims of negligence and intentional infliction of emotional distress under Tennessee law (*id.* at 27–29, 33, 36, 41, 45); and (7) Defendants have violated the Tennessee Constitution's prohibition against "intimidation, harassment, and abuse" in the "Tennessee state prison system"[4] (*id.* at 28).

However, with liberal construction of Plaintiff's complaint, the Court also finds that he has alleged facts implicating: (1) a failure-to-protect claim against Gaskin, Carol, and Dr. Jones

[4] Plaintiff cites Tenn. Const. art. 1, § 13 for this claim (Doc. 1, at 28).

(*id.* at 32); and (2) a due process claim related to the deprivation of funds in his inmate account (*id.* at 39–40). The Court addresses Plaintiff's constitutional claims first.

### *1. Section 1983 Claims*

#### **a. Time Barred Claims**

Tennessee's one-year statute of limitations for personal injury actions applies to Plaintiff's § 1983 claims. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); Tenn. Code Ann. § 28-3-104; *Foster v. State*, 150 S.W.3d 166, 168 (Tenn. Ct. App. 2004) (applying the one-year statute of limitations from Tenn. Code Ann. § 28-3-104 in a § 1983 claim). When the statute begins to run is an issue of federal law. *Eidson v. State of Tenn. Dep't of Children's Servs*., 510 F.3d 631, 635 (6th Cir. 2007) (citations omitted). Under federal law, a cause of action accrues, and the limitations period begins to run, when the injury forming the basis of the claim is discoverable. *See Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991) (citing *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)).

Plaintiff "filed" this action by submitting it to prison authorities for mailing on April 2, 2026 (Doc. 1, at 79). *See Houston v. Lack*, 487 U.S. 266, 273 (1988) (finding pro se prisoner's notice of appeal filed at moment of delivery to prison authorities for forwarding to district court). Therefore, Plaintiff's allegations concerning Warden Oakes' conduct on December 4, 2024; NP Duncan's discontinuation of his Depends in January 2025; Dr. Agard's rectal examination and subsequent Depends order in February 2025; and Dr. Jones' cursing at Plaintiff and his attempts to get Plaintiff to take a medication less expensive than gabapentin are all time-barred. Any injuries from these events were discoverable at the time they occurred, but they were not asserted within the one-year limitations deadline. Accordingly, these claims are properly dismissed as untimely. *See In re Royal Manor Mgmt., Inc*., 652 F. App'x 330, 339–40 (6th Cir. 2016) (noting that "courts have no authority" to modify "statute-of-limitations deadlines"). And as these

claims form the only factual basis of Plaintiff's claims against Warden Oakes[5] and/or Dr. Agard, they will be **DISMISSED** from this action.

### b. Threat of Force

Plaintiff alleges that Sgt. Armes and Cpl. Evans threatened to tase Plaintiff unless he complied with Sgt. Armes and Cpl. Evans' orders to move to the infirmary for Dr. Jones' test study. (*See* Doc. 1, at 18, 19.) Had they carried out their threat, Plaintiff maintains, their conduct would have constituted excessive force. (*See id.* at 19.) However, the threat of force is not the equivalent to an actionable use of force. *See, e.g.*, *Mattingly v. Barnes*, No. 3:14-CV-591-J-32JBT, 2018 WL 1496929, at *14 (M.D. Fla. Mar. 27, 2018), *aff'd sub nom. Mattingly v. Duval Cnty. Jail*, 777 F. App'x 971 (11th Cir. 2019) (noting "Plaintiff's allegation that Defendant Khan threatened to 'taze' him" failed to state a claim, as "verbal threats and harassment are generally not actionable under § 1983"); *Hamilton for J.H. v. Fort Wayne*, No. 16-cv-132, 2017 WL 5467038, *8 (N.D. Ind. 2017) ("The Court finds that a verbal warning about a particular use of force that never transpires is not the same as actually using the force."); *see also Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) ("[T]he action of a police officer in pointing a gun at a person is not, in and of itself, actionable[.]"). And the Sixth Circuit "has never found that pointing a taser, as opposed to actually discharging one, constitutes the use of excessive force." *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017). Accordingly, any claims against Defendants Armes and Evans related to their alleged threatened use of force will be **DISMISSED**.

---

[5] Insofar as Plaintiff seeks hold Warden Oakes liable for subsequent events merely because, as Warden, he is in charge and responsible for his subordinates, such claims are impermissible in a § 1983 action. *See Iqbal*, 556 U.S. at 676 ("[O]ur precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.").

### c. Failure to Protect/Exposure to Harm

Plaintiff contends that in June 2025, Lt. Carl Gaskin and Cpl. Carol "st[oo]d[] by watching" Dr. Jones remove a poisonous spider from a container in his pocket and throw it on Plaintiff's shoulder. (Doc. 1, at 32.) The Court finds this claim rises "to the level of the irrational or the wholly incredible" and thus is factually frivolous. *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992); *see also Huey v. Raymond*, 53 F. App'x 329, 330–31 (6th Cir. 2002) (dismissing as frivolous and finding plaintiff's claim that he was being poisoned "undoubtedly" presents a claim that is clearly baseless and "may be fairly described as fanciful, fantastic, delusional, wholly incredible, or irrational"); *Turner v. Yolo Cnty. Mayor*, No. 2:24-CV-2803 DC AC P, 2025 WL 2799733, at *2 (E.D. Cal. Oct. 1, 2025) (dismissing as factually frivolous complaint alleging, in part, that defendants "left poisonous spiders and snakes" at plaintiff's home to cause death of family members); *McGee v. Warden F/N/U Hayward*, No. SA-24-CV-00035-XR, 2025 WL 625694, at *1 (W.D. Tex. Feb. 24, 2025) (denying motion for reconsideration of dismissal of the plaintiff's complaint as frivolous where it "asserted fantastic or delusional scenarios" of inmates injecting him with substances and "throwing scorpions or spiders on him" at the Warden's instructions).

And the Court finds Plaintiff's allegations are not otherwise sufficient to state a plausible claim. The Eighth Amendment's prohibition on "cruel and unusual punishment" "places duties" on prison officials. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Those duties require officials to "take reasonable measures to guarantee the safety of" inmates. *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). But for a failure-to-protect claim to lie against a prison official, the plaintiff must show that: (1) objectively, he was incarcerated under conditions posing a substantial risk of serious harm; and (2) the official acted with deliberate indifference to

inmate safety, meaning the official was subjectively aware of the risk and fail[ed] to take reasonable measures to abate it." *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) (citations and quotations omitted) (alteration in original).

Here, Plaintiff does not explain how he knows the spider allegedly thrown on him was poisonous. But more importantly, he does not allege that Defendants Gaskin and/or Carol—or Dr. Jones, for that matter—knew the spider was poisonous. Therefore, Plaintiff's allegation that the spider was poisonous is not entitled to the presumption of truth. *See Smith v. Gen. Motors*, LLC, 988 F.3d 873, 885 (6th Cir. 2021) (holding complaints made "on information and belief" cannot rest on conclusory allegations, but rather, "must set forth a factual basis for such belief").

Nor does Plaintiff allege that he was injured by the exposure to the spider. That is, he does not allege facts suggesting that the mere exposure to a spider deprived him of his constitutional rights. And "[a] § 1983 claim only occurs when the threats or threatened conduct result in a constitutional deprivation." *Branham v. Grinage*, No. 88-1611, 1989 WL 11070, at *1 (6th Cir. Feb. 10, 1989) (citing *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985)). Accordingly, any claims against Defendants Armes, Evans, and/or Jones based on this alleged incident will be **DISMISSED**.

#### **d. Property**

Plaintiff maintains that Defendants Nurse Whitney and Elbert Springs each charged him a $10 medical fee for the same refused medical visit, which is both an "excessive fee and a violation of [TDOC] [p]olicy." (Doc. 1, at 39–40.) But these Defendants' alleged failure to follow TDOC policy does not give rise to a constitutional claim, as TDOC's policies and procedures do not create constitutionally protected interests. *See McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (holding failure to follow policy

directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest); *see also Stanley v. Vining*, 602 F. 3d 767, 769 (6th Cir. 2010) ("It has long been established that the violation of a state statute or regulation is insufficient alone to make a claim cognizable under § 1983.").

Neither can Plaintiff sustain a § 1983 claim because his property interest in his inmate account was infringed by the alleged double billing. The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment is not violated when a government employee deprives an individual of property, provided that the state provides a post-deprivation remedy. *Parratt v. Taylor*, 451 U.S. 527, 543 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (extending *Parratt*'s holding to intentional deprivations of property). Tennessee law provides for the recovery of personal property. *See McQuiston v. Ward*, No. 2001-201-COA-R3-CV, 2001 WL 839037, at * 1 (Tenn. Ct. App. July 25, 2001) (citing to Tenn. Code. Ann. § 29-30-101 and § 29-30-201). Plaintiff has not pled that Tennessee's procedures are inadequate for addressing the alleged wrong, as is necessary to sustain his § 1983 claim. *See Vicory v. Walton*, 721 F.2d 1062, 1063 (6th Cir. 1983). Accordingly, Plaintiff's claim for the deprivation of property against Defendants Whitney and Springs will be **DISMISSED**.

**e. Retaliation**

Plaintiff alleges that Dr. Jones performed a retaliatory "test study" on Plaintiff in May 2025, whereby he took Plaintiff's catheters, adult diapers, and wheelchair because Plaintiff filed grievances on Dr. Jones in January–February 2025 (*see* Doc. 1, at 17), and he was denied his wheelchair for two weeks by Dr. Jones and the nursing staff "out of staff retaliation" (*see id.* at

25). Plaintiff also claims that he was denied adult diapers out of "staff retaliation." (*Id.* at 31, 33.)

A retaliation claim requires a plaintiff to show three things: (1) he "engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)).

An inmate has a right to file non-frivolous grievances on his own behalf. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2003). Here, Plaintiff alleges that Dr. Jones stated he intended to subject Plaintiff to a study where he would be stripped of purportedly medically necessary supplies because Plaintiff filed an allegedly non-frivolous grievance against Dr. Jones. At this stage of the proceedings, the Court does not find that this allegation is "frivolous or malicious" or that it "fails to state a claim upon which relief may be granted[.]" Accordingly, Plaintiff's retaliation claim will **PROCEED** against Dr. Jones in his individual capacity. Because Plaintiff has not alleged, however, that Dr. Jones's actions were taken pursuant to or in furtherance of a custom or policy of Centurion, any claim against Dr. Jones for retaliation in his official capacity will be **DISMISSED**. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011)

(holding plaintiff must allege "a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation" of his rights).

The Court finds that Plaintiff has not set forth any facts to support his remaining allegations of "staff retaliation," and his subjective belief that he has been retaliated against is insufficient to state a claim. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir. 1997); *see also Cantley v. Armstrong*, 391 F. App'x 505, 507 (6th Cir. 2010) (affirming district court's holding that a prisoner's complaint was insufficient to demonstrate a causal relationship between protected activity and adverse action because "'bare allegations of malice on the defendants' parts are not enough to establish retaliation claims' that will survive § 1915A screening" (quoting *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001))). Accordingly, Plaintiff's remaining retaliation claims will be **DISMISSED** as conclusory. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Quisenberry v. Valentine*, No. 3:23-CV-P393-JHM, 2024 WL 1261911, at *2, 5 (W.D. Ky. Mar. 25, 2024) (holding that the plaintiff's assertion that a defendant housed a dangerous inmate near him "because I filed grievance" was conclusory and therefore did not state a plausible § 1983 retaliation claim).

#### f. Grievances

Plaintiff alleges that the non-response to his grievances and the failure to regularly check the grievance box in Unit 26-D "is deliberate indifference." (Doc. 1, at 35.) However, inmates have no constitutional right to a grievance procedure. *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003) (providing that a prisoner has "no inherent constitutional right to an effective prison grievance procedure"); *Walker v. Mich. Dep't of Corr*., 128 F. App'x 441, 445 (6th Cir. 2005) ("All circuits to consider this issue have . . . found that there is no constitutionally

protected due process right to unfettered access to prison grievance procedures.”). Thus, inmates have no attendant interest in having their grievances addressed or resolved. *See LaFlame v. Montgomery Cnty. Sheriff's Dep't*, 3 F. App'x 346, 348 (6th Cir. 2001) (holding jail staff's disregard of grievances did not state a § 1983 claim “because there is no inherent constitutional right to an effective prison grievance procedure”) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996))). Therefore, Plaintiff's grievance-related claims fail to state a § 1983 claim and will be **DISMISSED**.

**g. Thirteenth Amendment**

Plaintiff alleges that, by denying him medical supplies to address his serious medical needs, Defendants' conduct violates his Thirteenth Amendment “right to be free from involuntary servitude.” (Doc. 1, at 28–29.) The Thirteenth Amendment to the United States Constitution prohibits slavery and involuntary servitude, “except as a punishment for crime whereof the party shall have been duly convicted[.]” U.S. Const. amend. XIII, § 1. Plaintiff does not allege any facts suggesting that he is subjected to involuntary servitude. Therefore, this conclusory claim will be **DISMISSED**.

**h. Medical Care**

The cornerstone of Plaintiff's complaint is that he has been denied constitutionally adequate medical care. (*See generally* Doc. 1.) The Eighth Amendment's “cruel and unusual punishments” clause, applicable to the States through the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666–67 (1962), requires the government “to provide medical care for those whom it is punishing by incarceration.” *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). This does not require a prisoner “unqualified access to healthcare.” *Hudson v. McMillian*, 503

U.S. 1, 9 (1992). Instead, it proscribes acts or omissions that produce an "unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

An Eighth Amendment claim for the denial of adequate medical treatment is composed of two parts: (1) an objective component, which requires a plaintiff to show a "sufficiently serious" medical need; and (2) a subjective component, which requires the plaintiff to show the defendants acted with "deliberate indifference" to that need. *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994). The subjective component is met when officials know "of the facts that show the serious medical need" and they "personally conclude that this need exists." *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021). Under this standard, officials do not act with deliberate indifference when they reasonably respond to a serious medical need after they learn of it, even if the harm is not ultimately adverted. *Farmer*, 511 U.S. at 844. "In fact, a response does not exhibit deliberate indifference unless it reaches a culpability level higher 'than ordinary negligence.'" *Pearson v. Mich. Dep't of Corr.*, 170 F.4th 1027, 1037 (6th Cir. 2026) (citing *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024)).

Accordingly, a prisoner cannot state a claim of deliberate indifference by suggesting that he was misdiagnosed or not treated in a manner he desired. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995) (finding provider possibly negligent but not deliberately indifferent when unaware of prisoner's serious heart condition); *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997) (finding "misdiagnoses, negligence, and malpractice" are not "tantamount to deliberate indifference"). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105–06.

In his complaint, Plaintiff lodges § 1983 medical-care claims against Centurion, and all individual TDOC and Centurion Defendants in both their official and individual capacities (*see* Doc. 1, at 3). The Court addresses the official-capacity claims first.

***i) Official-Capacity Claims***

Plaintiff seeks to hold all Defendants liable in their official capacities as employees of Centurion or TDOC. (*See* Doc. 1, at 3.) By seeking relief against any individual Defendant in his/her official capacity, Plaintiff is actually seeking suit against the entity "of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

**A. TDOC Defendants**

Plaintiff cannot maintain a § 1983 claim against any of the TDOC Defendants in their official capacities. TDOC is an arm of the State of Tennessee. *See Hix v. Tenn. Dep't of Corrs.*, 196 F. App'x 350, 355 (6th Cir. 2006) (holding TDOC is equivalent of the "State"). And "a state is not a person within the meaning of § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989).

Also, the Eleventh Amendment typically "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments." *Thiokol Corp. v. Mich. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984)). Because there has not been congressional abrogation or waiver of immunity, Plaintiff's claims against Defendants in their official capacities are otherwise barred by the Eleventh Amendment. *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332, 345

(1979) (finding § 1983 does not waive state sovereign immunity); *Berndt v. State of Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) (holding Tennessee has not waived immunity to suit under § 1983). Therefore, Plaintiff cannot maintain an official-capacity suit against any of the TDOC Defendants, and all official- capacity claims against the individually named TDOC Defendants will be **DISMISSED**.[6]

### B. Centurion & Centurion Employees

As noted above, suit against the medical-provider employees in their official capacities is suit against Centurion itself. *See Graham*, 473 U.S. at 166; *Monell*, 436 U.S. at 690 n.55. But Centurion cannot be subject to § 1983 liability merely because it has employed someone who violated Plaintiff's constitutional rights. *See Monell*, 436 U.S. at 691 (noting § 1983 does not permit liability on a "*respondeat superior* theory"). Rather, to maintain a claim against Centurion, Plaintiff must identify a policy or custom of the entity and show that his particular injury was incurred due to the execution of that policy. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and quotation marks omitted); *see also Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011) (holding plaintiff must allege "a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation" of his rights).

[6] The *Ex Parte Young* doctrine allows a prisoner to obtain relief from an ongoing violation of federal law from a state official sued in his or her official capacity. *See Ex Parte Young*, 209 U.S. 123, 155–56 (1908). To determine if the exception is applicable, courts "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017) (quoting *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003)). Here, Plaintiff does not allege an ongoing violation of federal law by any TDOC employee, and thus, his claims do not fall within the *Ex Parte Young* exception.

Here, Plaintiff alleges that although he needs both diapers and catheters, he was only permitted orders for one of the items in order for Centurion to reduce expenses and cut costs. (Doc. 1, at 17, 26.) Accordingly, the Court finds Plaintiff has arguably stated a non-frivolous claim against Centurion for the denial of constitutionally adequate medical care, and this claim will **PROCEED**. But insofar as Plaintiff has sued the individual Centurion employee Defendants in their official capacities, all such claims will be **DISMISSED** as redundant to the claims against Centurion itself. *See Jackson v. Shelby Cnty. Gov't*, No. 07-6356, 2008 WL 4915434, at *2 (6th Cir. Nov. 10, 2008) (affirming dismissal of redundant official-capacity claims).

***ii) Individual-Capacity Claims***

To state a claim against any named Defendant in his or her respective individual capacity, Plaintiff must adequately plead that the Defendant, through his or her own actions, has violated the Constitution. *See Iqbal*, 556 U.S. at 676; *see also Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted). The Court addresses Plaintiff's individual-capacity claims topically, rather than Defendant by Defendant.

**A. Gabapentin**

Plaintiff complains that NP Barton discontinued his gabapentin prescription in April 2025 and placed him on an alternative, Pamelor (i.e. nortriptyline) that she already knew would be ineffective. (*See* Doc. 1, at 14–15.) But the exhibits attached to Plaintiff's complaint

demonstrate that Plaintiff's gabapentin, a controlled substance[7], was discontinued only after Plaintiff's noncompliance with and suspected diversion of the medication. (*Id.* at 55.) NP Barton's substitution of another (even if allegedly less effective) medication considering these circumstances is not deliberate indifference. Instead, the substitution was a reasonable response to Plaintiff's medical needs while taking into account his noncompliance and suspected misuse of the controlled medication. Therefore, any medical-care claims based on the denial of the prescription gabapentin will be **DISMISSED**.

### B. Wound Care

Plaintiff contends that during medication pass on July 4, 2025, Nurse Whitney asked Plaintiff how his bedsore had been treated, stated she would consult his chart to review the orders, and return to his cell. (*See id*. at 36.) Plaintiff maintains that when she returned, she stated she did not feel like entering Plaintiff's cell to perform wound care and provided Plaintiff with a dressing to place on the wound himself, though she failed to provide him anything with which to clean the wound. (*Id.*)

These allegations are insufficient to state a deliberate-indifference claim against Nurse Whitney related to Plaintiff's wound care. Plaintiff maintains that Nurse Whitney: (1) initiated the conversation into whether Plaintiff's bedsore had been treated while performing medication pass, (2) stated her intention to consult Plaintiff's chart, and (3) returned to Plaintiff's cell with supplies with which to cover Plaintiff's wound. And while Plaintiff complains that she did not provide him "anything" to clean the wound, it is apparent from Plaintiff's complaint that he was permitted to keep medical supplies in his cell. He does not allege that he told Nurse Whitney he

[7] Gabapentin is a controlled substance in Tennessee. *See* https://www.drugs.com/medical-answers/gabapentin-narcotic-controlled-substance-3555993/ (last visited Aug. 18, 2026).

did not have any means to clean his wound, nor does he advance any facts suggesting that Nurse Whitney knew that Plaintiff did not have any means to clean his wound. Therefore, Plaintiff has failed to state a claim against Nurse Whitney related to his wound care.

Further, to the extent Plaintiff seeks to impose liability against any Defendant for the approximate two weeks he allegedly went without wound care, he fails to name any individual who denied him wound care. And, as noted above, § 1983 liability lies only for one's own involvement in the alleged constitutional wrongdoing. *See Iqbal*, 556 U.S. at 676. Accordingly, Plaintiff has not stated a claim related to the denial of wound care, and this claim will be **DISMISSED**.

### C. Medical Supplies

Plaintiff maintains that after Dr. Jones decided to perform a "test study" on Plaintiff in May 2025, he was temporarily deprived of access to his wheelchair and thereafter routinely had trouble getting consistent access to catheters and adult diapers, despite his partial paralysis and incontinence. (*See, e.g.*, Doc. 1, at 19–45.) He contends that he developed at least two MRSA infections because of Defendants' refusal to provide him supplies to manage his incontinence. (*Id.* at 36–37, 44–45.) And he alleges that all Defendants' refusals originated from Dr. Jones' orders discontinuing Plaintiff's orders for adult diapers. (*Id.* at 19–45.) Therefore, the Court finds Plaintiff has stated a non-frivolous claim of deliberate indifference against Dr. Jones related to the denial of constitutionally adequate medical treatment, and this claim will **PROCEED** against Dr. Jones individually.

The Court also finds that Plaintiff has stated non-frivolous claims of deliberate indifference against Nurses Amanda, Beth, and Kristy, as he alleges that each of these Defendants denied (at least temporarily) his requests for catheters, despite Dr. Jones entering

orders for Plaintiff to be provided catheters as needed. This claim will **PROCEED** against Defendants Nurses Amanda, Beth, and Kristy in their individual capacities.

Plaintiff cannot, however, state a plausible deliberate-indifference claim against Nurse Tyler, Nurse Brad, Nurse Deniece, Nurse Bowlin, Nurse Elizabeth, Nurse Jesse, Nurse Sharp, and MA Dvorak. Plaintiff alleges that these medical personnel failed to provide him with Depends upon his request. However, Plaintiff notes throughout his complaint that he did not have an active order for Depends during the relevant times.[8] And the nursing staff cannot be deemed deliberately indifferent for reasonably following the orders entered by Plaintiff's treatment physicians. *See Bauer v. Kramer*, 424 F. App'x 917, 919 (11th Cir. 2011) (holding "[a] nurse is not deliberately indifferent when she reasonably follows a doctor's orders"). Accordingly, Plaintiff's deliberate-indifference claims against these Defendants will be **DISMISSED**.

Plaintiff also asserts deliberate-indifference claims against NPs Duncan, Cline, and White, for their failure to renew Plaintiff's order for Depends. (*See* Doc. 1, at 29–30, 37.) These medical Defendants, unlike members of the nursing staff, can enter orders for treatment, albeit such orders must be in collaboration with a licensed physician.[9] But Plaintiff states that NP Duncan stated she did not believe Plaintiff needed adult diapers since he used catheters, NP White stated that Dr. Jones did not want the staff to order Plaintiff both catheters and Depends, and NP Cline also stated that Dr. Jones did not want Depends ordered for Plaintiff. (Doc. 1, at

---

[8] The same is true as to Plaintiff's allegation that staff denied him a wheelchair for a two-week period. (*Id.* at 25–26.) Dr. Jones discontinued Plaintiff's wheelchair order for that two-week "test study" period. (*Id.* at 21, 22.)

[9] *See* American Ass. of Nurse Practitioners, *State Policy Fact Sheet: Tennessee*, https://storage.aanp.org/www/documents/no-index/state-fact-sheets/tennessee.pdf (last visited Aug. 18, 2026).

29–30.) Plaintiff has not alleged facts to suggest that Defendants personally knew that Plaintiff had a serious medical need for Depends in addition to catheters but withheld treatment in disregard of that need. And Plaintiff's allegations otherwise indicate that the NP Defendants' treatment of Plaintiff was curtailed—not by deliberate withholding of medical supplies—but by the instructions of their supervising physician, Medical Director Dr. Jones. Accordingly, Plaintiff's deliberate-indifference claims against these Defendants will be **DISMISSED**.[10]

Plaintiff has also named HSA Wright as a Defendant, but his only allegations against this Defendant are that he failed to respond to Plaintiff's letter, and that he responded to Plaintiff's grievances. (*See* Doc. 1, at 35, 55, 70.) However, Plaintiff cannot maintain a constitutional claim related to a grievance response, *see LaFlame,* 3 F. App'x at 348, and § 1983 liability cannot be based on a failure to act, *see Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (holding "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act") (citation and internal quotation marks omitted). Accordingly, Plaintiff's deliberate indifference claims against Defendant Wright will be **DISMISSED**.

Plaintiff also implies that TDOC staff met his medical needs with deliberate indifference. Specifically, he notes that: (1) Officer Delvin sent medical personnel to Plaintiff's cell to address Plaintiff's "emergency" request for Depends so that he could attend his special needs appointment (*see* Doc. 1, at 37–38); (2) Sgt. Pappas was involved in the events that resulted in Plaintiff missing his telehealth appointment because he did not have a Depends (*see id.* at 67–68); and (3) Cpl. Allen was also involved in the missed telehealth appointment and stated he would check with medical concerning Plaintiff's requests for Depends and new pants but did not

[10] The Court notes that NPs Cline and White, on separate occasions, diagnosed Plaintiff with MRSA and ordered antibiotics to treat the condition. (*Id.* at 37, 44.)

provide them, instead returning to Plaintiff's cell's cell with a disciplinary write up for refusing a cell assignment (*see id.*)

However, Plaintiff cannot maintain a § 1983 deliberate-indifference claim against these officers, because he contends that these Defendants contacted medical following Plaintiff's request for Depends. And TDOC personnel are not responsible for whether medical care is ultimately rendered by medical staff. *See Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (holding it is not "unconstitutional for municipalities and their employees 'to rely on medical judgments made by medical professionals responsible for prisoner care'"). Accordingly, Plaintiff's deliberate-indifference claims against these Defendants will be **DISMISSED**.[11]

***2. State-Law Claims***

Plaintiff maintains that by ignoring his medical need for catheters, adult diapers, and a wheelchair, Defendants violated the Tennessee Constitution, as well as Tennessee laws governing intentional infliction of emotional distress ("IIED") and negligence. (*See* Doc. 1, at 28–29.)

First, the Court addresses Plaintiff's IIED claim. Under Tennessee law, a plaintiff states an IIED claim by alleging intentional or reckless conduct by the remaining Defendants "so outrageous that it is not tolerated by civilized society" that "resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012). But in his

[11] Further, to the extent Plaintiff intends to assert a claim against Cpl. Allen for the allegedly false disciplinary write-up for refusing a cell assignment, such an allegation fails to state a claim. *See Wolff v. McDonnel*, 418 U.S. 539, 564–71 (1974) (finding inmates possess no right to be free from convictions for disciplinary offenses); *Person v. Campbell*, No. 98–5638, 1999 WL 454819, at *1 (6th Cir. June 21, 1999) ("[T]he filing of false disciplinary charges against an inmate does not constitute a constitutional violation redressable under § 1983.").

complaint, Plaintiff alleges only that he has a right to be free from IIED, "which is also hard to endure and falls also under serious depression." (Doc. 1, at 28–29), and that Defendants' conduct "caus[ed] the plaintiff unnecessary emotional and physical pain and suffering" (*id.* at 47). These are conclusions of injury. And even though Tennessee employs a liberal pleading standard, a plaintiff is still required "to state the facts upon which a claim for relief is founded." *Webb v. Nashville Area Habitat for Humanity, Inc*., 346 S.W.3d 422, 426 (Tenn. 2011). Here, Plaintiff has not alleged any facts demonstrating that he has endured serious mental injury as a result of any named Defendants' allegedly outrageous conduct. Therefore, Plaintiff's IIED claim will be **DISMISSED**.

Second, Plaintiff cannot maintain a claim for violation of the Tennessee Constitution, as it provides no private right of action. *See, e.g.*, *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996); *Wooley v. Madison Cnty*., 209 F. Supp. 2d 836, 844 (W.D. Tenn. 2002). Accordingly, Plaintiff's claims for a violation of his rights under the Tennessee Constitution will be **DISMISSED**.

This leaves Plaintiff's negligence claim. Inasmuch as the Court will permit certain federal claims to proceed against Defendants Centurion, Dr. Jones, and Nurses Human, Wyrick, and Hill, it will likewise permit Plaintiff's state-law negligence claim to **PROCEED** against these Defendants. Plaintiff has not, however, stated sufficient facts to render it plausible that any remaining Defendant breached a duty of care owed to Plaintiff that was both the factual and legal cause of injury to Plaintiff to state a negligence claim under Tennessee law. *See Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008). Therefore, Plaintiff's negligence claim will be **DISMISSED** against the remaining Defendants.

## III. CONCLUSION

For the reasons set forth above:

1. Plaintiff's motion for leave to proceed *in forma pauperis* (Doc. 6) is **GRANTED**;

2. Plaintiff is **ASSESSED** the civil filing fee of $350.00;

3. The custodian of Plaintiff's inmate trust account is **DIRECTED** to submit the filing fee to the Clerk in the manner set forth above;

4. Plaintiff's motion for the appointment of counsel (Doc. 7) is **DENIED**;

5. Plaintiff's motion to correct Defendants' names (Doc. 9) is **GRANTED**, and the Clerk is **DIRECTED** to update the docket to correctly reflect Nurse Deniece as "Nurse Deniece Davis"; Nurse Beth as "Nurse Bethany Wyrick"; Nurse Elizabeth as "Nurse Elizabeth Byrd"; Nurse Sharp as "Nurse Darla Sharp"; and Nurse Amanda as "Nurse Amanda Hill";

6. Plaintiff's motion to re-file motions from his miscellaneous case (Doc. 10) is **DENIED as moot**;

7. Plaintiff's motion to effect service of process (Doc. 11) is **GRANTED** insofar as the USMS will be directed to effect service in this case;

8. Plaintiff's motion for a ruling on his pending motions (Doc. 13) is **GRANTED** by entry of this Order;

9. The following claims are non-frivolous and will **PROCEED**: (1) Plaintiff's retaliation claim against Dr. Jones; (2) Plaintiff's deliberate-indifference claims against Centurion, Dr. Jones, and Nurses Amanda Hill, Kristy Human, and Bethany Wyrick; and (3) Plaintiff's State-law negligence claims against Defendants Centurion, Dr. Jones, and Nurses Amanda, Kristy, and Beth;

10. The Clerk is **DIRECTED** to send Plaintiff service packets (a blank summons and USM 285 form) for Defendants Centurion, Dr. Jones, Nurse Amanda, Nurse Kristy, and Nurse Beth;

11. Plaintiff is **ORDERED** to complete the service packets and return them to the Clerk's Office within twenty-one (21) days of entry of this Order;

12. At that time, the summonses will be signed and sealed by the Clerk and forwarded to the U.S. Marshal for service, *see* Fed. R. Civ. P. 4;

13. Plaintiff is **NOTIFIED** that if he fails to timely return the completed service packets, this action will be dismissed;

14. Defendants shall answer or otherwise respond to the complaint within twenty-one (21) days from the date of service. If any Defendant fails to timely respond to the complaint, it may result in entry of judgment by default against that Defendant;

15. All other claims and Defendants are hereby **DISMISSED**;

16. Plaintiff is **ORDERED** to immediately inform the Court and Defendant or her counsel of record of any address changes in writing. Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his address, to monitor the progress of the case, and to prosecute or defend the action diligently. E.D. Tenn. L.R. 83.13. Failure to provide a correct address to this Court within fourteen (14) days of any change in address may result in the dismissal of this action.

**SO ORDERED**.

**/s/ *Travis R. McDonough***
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**